## James Talcott, Inc. v. Fred Ratowsky Associates, Inc.

*Edward W. Rothman* and *Moses K. Rosenberg,* for plaintiff.

*Louis J. Adler,* for defendant.

SHELLEY, J., October 25, 1965.—This matter comes before us on a case stated basis. The parties, under the provisions of the Act of April 22, 1874, P. L. 109, 12 PS §688 et seq., have entered into a stipulation for the trial of this case without a jury. The parties have also stipulated the facts. We adopt their stipulation as our findings of fact and incorporate the same herein by reference. In the course of our opinion, we will discuss those facts which, in our judgment, are essential to the disposition of this case.

Plaintiff, James Talcott, Inc. (hereinafter referred to as "plaintiff" or "Talcott") is a New York business corporation, with its principal place of business in New York City. Defendant, Fred Ratowsky Associates, Inc. (hereinafter referred to as "defendant" or "Ratowsky") is a Delaware corporation and, at the

time of the suit, conducted business in Dauphin County, Pa.

On September 8, 1959, Sayve Corporation of America (hereinafter referred to as "Sayve") sold a coin-operated laundry, including building, to M.G.B. Corporation (hereinafter referred to as "M.G.B."). Part of the consideration was an installment judgment note and an installment sales contract. Ratowsky is the payee on the note and designated as the seller on the sales contract. It appears that arrangements had been made by Sayve with Talcott to purchase the note. However, Talcott "required an additional signature together with those of M.G.B. Corporation and its principals before . . . Talcott . . . would consent to purchase the note". Ratowsky had sold no equipment in conjunction with the transaction, nor did any money pass through its hands. On the same day, to wit, September 8, 1959, Ratowsky, at the request of Sayve, endorsed the note: "pay to the order of James Talcott, Inc., 225 Fourth Avenue, New York, New York". On the same day, Ratowsky delivered the note to Sayve that it might be delivered to Talcott. Before Sayve delivered the note to Talcott on October 8, 1959, the note was altered without Talcott's knowledge, in that the name of the payee on the endorsement of the note was changed from Talcott to Sayve Corporation. There was attached to the note a separate instrument, upon which Sayve was the unconditional endorser with recourse. The same was clipped to the note. Sayve "agreed that it would completely indemnify and save . . . Ratowsky . . . harmless from any loss in connection with the endorsement". Talcott relied on all of the endorsements appearing on the note in extending credit thereon. M.G.B. defaulted on the note on July 1, 1961. On May 27, 1962, Talcott returned the note to Sayve, who endorsed the note: "pay to the order of James Talcott, Inc. with recourse". On March

13, 1963, the laundry was damaged by fire, and the insurance carrier paid Talcott $5,000, and on April 29, 1963, M.G.B. paid $2,000 to Talcott. There is presently due and owing on the note the sum of $13,272.20.

In conjunction with the sale, an installment sales contract was executed and transferred by the various parties at approximately the same time, in the same manner, under the same circumstances, and with the same alteration as took place in the transfer of the note described above.

Attached to the amended complaint as exhibit "A" was the note referred to above, and "clipped" to it was a paper, which plaintiff contends was an "allonge".

An "allonge" is a piece of paper annexed to a bill of exchange or promissory note on which to write endorsements for which there is no room on the instrument itself.

Defendant contends that the attached paper was not an "allonge".

The answer to the question must be found in an interpretation of the Uniform Commercial Code (hereinafter referred to as "U.C.C."), which provides that "An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof", as applied to the circumstances of this case.[1]

The Negotiable Instruments Act[2] provided that "The indorsement must be written on the instrument itself or upon a paper attached thereto". A comparison of the provisions of the two acts indicates that the legislature intended, by the provision of the Uniform Commercial Code, to sanction the use of the "allonge", but added the additional provision that the "allonge"

---

[1] Act of April 6, 1953, P. L. 3, sec. 3-202(2), 12A PS §3-202(2).

[2] Act of May 16, 1901, P. L. 194, chapter I, art. III, sec 31.

The Negotiable Instruments Act was repealed by the Uniform Commercial Code.

be not merely attached to the instrument, but required that it be *firmly affixed*[3] to the note. There is no doubt that the reason for this added requirement was that it was not intended to establish the loose and undesirable practice of making regular endorsements of commercial paper by a writing on the back of any other paper or document to which it might have been temporarily attached, as by pinning, especially when there is ample space for the endorsement on the back of the instrument itself.

Plaintiff urges upon us to substantiate its position: Heister v. Gilmore, 5 Phila. 62 (1862). We do not think the legal principle enunciated in that case is presently the law in Pennsylvania. Most authorities recognize that an endorsement may be made by means of an "allonge", where the instrument is so covered with previous endorsements that convenience or necessity requires additional space for further endorsements.

Heister v. Gilmore, supra, along with some early Wisconsin cases, adopted a minority ruling.[4] It is noted that Heister v. Gilmore, supra, was decided in 1862, which was almost 40 years before the enactment

---

[3] Italics supplied.

[4] In Heister v. Gilmore, the court said:

"That an indorsement may be written on a separate paper from the note has not been disputed. Such a paper the French call an *allonge*. It is contended, however, that such a separate indorsement is not lawful, unless the back of the note is already so full of names that no more can be conveniently added . . . It is true that this is the reason usually for the use of an *allonge*, but we do not understand it as meaning that an *allonge* can never be used except in this case. On the contrary, it seems to us to give an unlimited power to make use of an *allonge* whenever it is convenient to do so. Where the bill or note has been mislaid, or is at a distance, is another case in which it seems equally necessary and proper that the indorsement should be on a separate paper. As to the necessity of its being annexed to the note as soon as made, the books are silent; they do not say when or where it is to be annexed".

of the Negotiable Instruments Act and more than 90 years before the enactment of the Uniform Commercial Code.

For some unexplained reason, neither the original note nor the instrument purporting to be an "allonge" was exhibited to us at any time during the litigation; only photostatic copies were attached to the pleadings. We have no way of determining the method of attachment of the alleged "allonge", except by the use of the word "clipped" in the stipulation of facts.[5] As we understand the word "clip", it means to "clasp" or "fasten with a clip", which usually denotes a temporary method of attachment, and is not nearly as secure as the method of stapling or riveting or the use of an adhesive preparation, such as glue, mucilage or paste.

An examination of the note indicates that there was sufficient space on the back of the note for a second endorsement; in fact, one was eventually placed thereon after default by the maker. It is also noted that only the note was attached to the original complaint without any additional paper. Reference to an alleged "allonge" first appeared in the amended complaint. This would indicate that, as a matter of law, any arrangement which is so flexible could not possibly meet the requirements of the Uniform Commercial Code. Plaintiff itself, by its own acts, has indicated its doubt in the efficacy of the endorsement which appeared on the alleged "allonge" by having the endorsement re-executed by Sayve.

We, accordingly, conclude that the paper attached to the note was not an "allonge".

---

[5] Stipulation of fact no. 15 reads: "On October 8, 1959, Sayve Corporation of America, by its duly authorized agent, R. E. Foreman, for value received executed the instrument attached to the amended complaint and forming a part of Exhibit A and delivered the same to plaintiff at or about said date. The same was *clipped* to the note appearing as part of the exhibit". (Italics supplied.)

Section 3-415(1) of the U.C.C. provides: "An accommodation party is one who signs the instrument in any capacity as surety for another party to it". The stipulation avers facts from which we must conclude that Ratowsky was an accommodation party.

The U.C.C. defines a holder as ". . . a person who is in possession of . . . an instrument . . . issued or indorsed to him or to his order . . ." [6] Because the paper attached to the note was not an "allonge", it is clear that on October 8, 1959, plaintiff was not in possession of an instrument endorsed to it or to its order and, therefore, was not a holder.

However, in section 3-415(2), 12A PS §3-415(2), U.C.C. defines the contract of an accommodation party. Specifically, it imposes liability on an accommodation party to pay a person who has taken the instrument for value before it was due.[7]

Defendant interprets section 3-415(2), supra, as requiring the person taking the instrument to be a holder. Defendant argues that since plaintiff did not become a holder until after default, the accommodation party is not liable. To sustain defendant's interpretation, it would be necessary to substitute the word "holder" for the word "taker".

On the other hand, plaintiff argues that section 3-415(2), supra, is effective, and that it did, on October 8, 1959, take the instrument for value before it was due and, therefore, the accommodation party is liable.

Plaintiff further claims that section 3-415(2), supra, is operable, even though the person "taking" is not a "holder". Plaintiff avers that when it originally acquired the instrument, although it may not have been a "holder", it was, nonetheless, a "taker", as that word is used in section 3-415(2). Being a "taker" for value before the instrument was due, plaintiff claims that

---

[6] Section 1-201(20); 12A PS §1-201(20).

[7] Section 3-415(2) provides that: "When the instrument has

it comes within the purview of section 3-415(2) and, therefore, it may recover from defendant.

We agree with plaintiff's interpretation of section 3-415(2). The word "holder" has been given a precise definition by the framers of the U.C.C.[8] The importance of a person acquiring the status of a "holder" is evident from section 3-202, in that a person becomes a "holder" only through negotiation, and that only a "holder" may make an endorsement.[9] Furthermore, the entire part 3 of article 3 of the U.C.C. deals with the rights of a person who qualifies as a "holder".

But even more significant is part 4 of article 3, which deals with the liability of parties. Thus, section 3-413(2)[10] imposes a duty on the drawer to pay *either* the "holder" *or* any endorser who has "taken" up the instrument. Similarly, section 3-414(1)[11] provides

---

been taken for value before it is due the accommodation party is liable in the capacity in which he has signed even though the taker knows of the accommodation".

[8] Section 1-201(20) provides: "'Holder' means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank".

[9] Section 3-202 provides that:

"1. Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order, it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery.

"2. An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof".

[10] Section 3-413(2) of the U.C.C. provides: "The drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder ·or to any indorser who takes it up. The drawer may disclaim this liability by drawing without recourse".

[11] Section 3-414(1) of the U.C.C. provides: "Unless the indorsement otherwise specifies (as by such words as 'without re-

that an endorser must pay *either* the "holder" *or* any subsequent endorser who has "taken" up the instrument. The absence of the word "holder" in the very next section, i.e., 3-415(2), supra, leads us to only one conclusion. The legislature must have intended that the accommodation party is liable to a person who has "taken" the instrument for value before it was due, even though that person is not a "holder".

Accordingly, we conclude that defendant is liable to plaintiff in the sum claimed to be due on the note, to wit, $13,272.20, with interest.

We might note, parenthetically, that the result which we reach is in substantial accord with the original intentions of the parties. The stipulation of facts reveals that plaintiff required an additional signature before its purchase of the note. This signature was supplied by defendant at the request of Sayve. The obvious intent here was that if the primary party defaulted, plaintiff would hold defendant liable. This intention is now realized, by virtue of the result in this opinion. At the same time, Sayve promised to indemnify defendant for any loss in connection with the endorsement. Whether this intention will be realized is a question not now before us.

Accordingly, we enter the following

## Order

And now, October 25, 1965, judgment in the amount of $13,272.20, with legal interest, is entered for plaintiff and against defendant. Costs to be paid by defendant.

---

course') every indorser engages that upon dishonor and any necessary notice of dishonor and protest he will pay the instrument according to its tenor at the time of his indorsement to the holder or to any subsequent indorser who takes it up, even though the indorser who takes it up was not obligated to do so".